FILED'08 DEC 18 16:24USDC-ORP

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LOURDES N. YZAGUIRRE,                              CV. 07-6307-AC

               Plaintiff,                      FINDINGS AND
                                                   RECOMMENDATION

     v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

               Defendant.

_____

ACOSTA, Magistrate Judge:

      Claimant Lourdes N. Yzaguirre ("Claimant") seeks judicial review of a final decision of the

Commissioner of Social Security ("Commissioner") denying her application for Supplemental

Security Income ("SSI") disability benefits under Title XVI of the Social Security Act ("SSA"). *See*

42 U.S.C. §§ 1381-83f (2008). This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g). Following a careful review of the record, the court concludes that the decision of the Commissioner should be remanded for further proceedings.

*Procedural History*

Claimant filed her initial application for SSI under section 1614(a)(3)(A) of the Social Security Act on August 5, 2002, citing an initial disability onset date of June 1, 1989. 42 U.S.C. § 1382c(a)(3)(A) (2008). The claim was denied initially and on reconsideration. On September 27, 2004, a hearing was held before an Administrative Law Judge ("ALJ"), who issued a decision on November 5, 2004, finding Claimant not disabled. Claimant requested review of this decision on January 4, 2005. This request was granted on March 3, 2006, when the Appeals Council "vacat[ed] the hearing decision and remand[ed] the case for further proceedings." (Tr. 222.) The remand order directed the ALJ to "obtain all available updated medical records from the claimant's treating sources, give [Claimant] an opportunity for a *de novo* hearing, and give further consideration to [Claimant's] maximum residual functional capacity, including possible nonexertional limitations." (Tr. 222.) The order also called for additional evaluation of the following: whether claimant had any past relevant work, whether she was capable of performing that work, and how Claimant's nonexertional limitations further eroded her occupational base. The ALJ was also ordered to consult a Vocational Expert ("VE") to "identify examples of jobs [Claimant] could perform and [] state the incidence of such jobs in the national economy." (Tr. 223.) Another reason for the remand was an "inability to locate the hearing tape." (Tr. 228.) The tape was later located, but as it was not the sole basis for the remand, it did not extinguish the need for the remand. (Tr. 228.)

On November 13, 2006, a second hearing before the ALJ was held. The decision was issued

on December 21, 2006, again denying benefits. Claimant requested review of the ALJ's decision on February 21, 2007. This request was denied on August 25, 2007, at which time the ALJ's decision again became final. Claimant filed for review of the final decision in this court on October 24, 2007.

*Standard of Review*

This court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *see also Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Tylitzki v. Shalala*, 999 F.2d 1411, 1413 (9th Cir. 1993). The court must weigh "both the evidence that supports and detracts from the [Commissioner's] conclusion." *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld if it is a rational interpretation of the evidence, even if there are other possible rational interpretations. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989); *Andrews*, 53 F.3d at 1039-1040. The reviewing court may not substitute its judgment for that of the Commissioner. *Robbins v. SSA*, 466 F.3d 880, 882 (9th Cir. 2006).

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Andrews*, 53 F.3d at 1039. In determining a claimant's residual functional capacity ("RFC"), an ALJ must consider all relevant evidence in the record, including, *inter alia,* medical records, lay evidence, and "the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins*, 466 F.3d at 883, *citing* SSR 96-8p, 1996 WL 374184, at *5; 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3); *Smolen v. Chater*,

80 F.3d 1273, 1281 (9th Cir.1996).

*Summary of the ALJ's Findings*

The ALJ engaged in the five-step "sequential evaluation" process when he evaluated Claimant's disability, as required. *See* C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

I.     Steps One and Two

At Step One, the ALJ concluded that Plaintiff had not engaged in any substantial gainful activity since the onset of her alleged disability. (Tr. 25.) At Step Two, the ALJ determined that Claimant had the following severe impairments: fibromyalgia, status-post bilateral carpal tunnel release, and diabetes mellitus. (Tr. 25.) He also found that Claimant suffered from the following non-severe impairments: depression, possession of the sickle cell trait, rotator cuff problems, hypertension, and asthma. (Tr. 26.) The ALJ's specific findings as to each impairment, both severe and non-severe, are detailed below.

a.     *Fibromyalgia*

Claimant "subjectively complain[ed] of diffuse generalized myalgia type pain all over including in both shoulders." (Tr. 26.) The ALJ cited Dr. Owen-Taylor's assessment on August 27, 2001, that Claimant probably suffered from fibromyalgia, with multiple symptoms. (Tr. 26.) Dr. Owen-Thayer observed in May 2004 that Claimant probably suffered from fibromyalgia and had been doing well on Celexa, but that she did not desire treatment, or to continue using Celexa. (Tr. 27.) Dr. Owen-Taylor also observed, on August 26, 2004, that Claimant suffered from a combination of depression and fibromyalgia, which responded well to Lexapro. (Tr. 27.)

The ALJ noted that Claimant began seeing a new primary care physician, Dr. Susan

4    FINDINGS & RECOMMENDATION                                      {KPR}

Newcomb, and that on May 26, 2005, Dr. Newcomb "increas[ed] her Lexapro to 20 milligrams a day for her fibromyalgia." (Tr. 27.) On August 8, 2006, Claimant told Dr. Newcomb that she was trying to get a job, but that her chronic pain and fibromyalgia prevented her from doing so. (Tr. 28.) The ALJ noted that, contrary to this report, Claimant was working as a pizza delivery driver from December 2005 through April 2006. Also, the ALJ pointed out that, after examining Claimant on September 7, 2006, Dr. Newcomb did not mention fibromyalgia in her report. Also related to fibromyalgia, the ALJ wrote that "[a]t the hearing [Claimant] admitted she 'blacked-out' portions of an exhibit dated May 26, 2004." The exhibit originally read "She does not feel that she has fibromyalgia," but had been altered to read "she has fibromyalgia." (Tr. 27.)

        b.    *Carpal Tunnel*

        The ALJ noted that Claimant "had undergone left carpal tunnel release in December of 2000 with no subsequent symptomology through the date of this decision." (Tr. 26.)

        c.    *Diabetes*

        On May 26, 2004, Dr. Owen-Taylor assessed Claimant's diabetes, finding that it was "under fair control with an A1c blood glucose level of 7.4 and blood sugar reading of 100." (Tr. 27.) On August 26, 2004, Dr. Owen-Taylor noted Claimant's "blood sugars generally at less than 126 with occasional readings in the 150-160 range," and stated that Claimant "understands her diabetes quite well." (Tr. 27.) Then, on September 7, 2006, Dr. Newcomb assessed Claimant's diabetes as "controlled." (Tr. 28.)

        d.    *Depression*

        After her August 27, 2001, examination of Claimant, Dr. Owen-Taylor did not specifically mention depression, but cited a "long conversation with claimant regarding the antidepressant

medication Zoloft and [that] samples were given to the claimant." (Tr. 26.)  On August 8, 2006, Dr. Newcomb observed that Claimant had a difficult year due to her husband leaving her but, nonetheless, that Claimant felt that she was "actually managing quite well." (Tr. 28.)  One month later, Dr. Newcomb did not mention Claimant's depression at all.  (Tr. 28.)

      e.     *Sickle cell trait*

Claimant tested positive for the sickle cell trait in September 1998, but has since been asymptomatic.  (Tr. 26.)  In December 2001, Claimant was evaluated by Dr. Kenyon, who "opined that her musculoskeletal symptoms were inconsistent with and not likely related to her sickle cell trait history." (Tr. 27.)

      f.     *Rotator cuff*

On January 23, 2001, Claimant complained to Dr. Stanley, an orthopedic surgeon about shoulder pain and difficulty raising her arm.  After "magnetic resonance imaging (MRI) revealed a rotator cuff tear," Dr. Stanley performed surgery on Claimant's right shoulder.  (Tr. 26.)  This procedure included "debridement of labrum; open bursectomy and open rotator cuff repair." (Tr. 26.)  Regarding her recovery, the ALJ summarized:  "The claimant's shoulder recovery is noted throughout the records as unremarkable and functioning in her right shoulder is normal based on objective imaging." (Tr. 26.)  The ALJ felt that Claimant's complaints were exaggerated and noted that her symptoms, as reported, varied over time.  Dr. Stanley reported, on November 6, 2000, that "her subjective complaints are so bad that he couldn't even truly evaluate her problem." (Tr. 26.)  In early 2001, Claimant reported to her physical therapist only "occasional discomfort," but on August 27, 2001, Claimant told Dr. Owen-Taylor that "her arm pain is just unbearable" since her surgery.  Despite this report, rotation of her arms revealed no abnormalities.  (Tr. 26.)  An MRI

performed in February 2003 revealed "no acute abnormalities." (Tr. 26.) On May 26, 2005, Claimant complained to Dr. Newcomb of pain radiating from the left side of her neck down into her left wrist. Dr. Newcomb observed Claimant's limited range of motion which "appear[ed] to be more of a pain issue than weakness." (Tr. 27.) Dr. Newcomb also "suggested [Claimant] continue taking ibuprofen and started her on Flexeril . . . ." (Tr. 27.)

g.    *Hypertension*

On August 27, 2001, Dr. Owen-Taylor reported that claimant suffered from borderline hypertension related to weight. (Tr. 26.) Again, on May 26, 2004, Dr. Owen-Taylor observed that claimant had borderline hypertension. Weight loss and exercise were recommended. (Tr. 27.)

h.    *Asthma*

On August 27, 2001, the Claimant reported to Dr. Owen-Taylor that her reactive airway disease (a common synonym for asthma) had improved and that she was using inhalers and Singulair, a prescription medication, effectively. Dr. Owen-Taylor assessed Claimant as having stable reactive airway disease, and recommended continuing the current course of treatment. (Tr. 26.) On August 26, 2004, Claimant's asthma was "assessed as mild." (Tr. 27.) (internal quotations omitted.) On September 7, 2006, Dr. Newcomb did not mention Claimant's asthma at all. (Tr. 28.)

i.    *Claimant's credibility and activity level*

First, the ALJ discounted a letter written by Dr. Owen-Taylor on the grounds that Dr. Owen-Taylor "presented neither an opinion nor did she reference any medical signs or clinical findings to support an opinion in favor of disability." (Tr. 27.) Second, the ALJ noted that Claimant had blacked out a portion of her medical history in an attempt to mislead the ALJ. (Tr. 27.) Third, Claimant told Dr. Newcomb, on May 26, 2005, that she went on daily walks. (Tr. 27.) Fourth, she

complained to Dr. Newcomb, on August 8, 2006, that she was attempting to find work but could not, due to her fibromyalgia. The ALJ noted that this was contrary to her work as a pizza delivery driver from December 2005 to April 2006. (Tr. 28.) Fifth, on September 7, 2006, Claimant told Dr. Newcomb that she was walking daily, trying to work up to thirty minutes a day. Again, the ALJ cited her work as a pizza delivery driver. (Tr. 28.)

Based on the above evidence, the ALJ found that Claimant's "combined severe and non-severe impairments may cause some limitations in work, although none of her doctors listed any functional limitations. Overall, the [ALJ found] her possible limitations from her combined severe and non-severe impairments clearly do not preclude her from work." (Tr. 28.)

II.    Step Three

At Step Three, the ALJ found that Claimant "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (Tr. 28.) In particular, the ALJ considered the following listings: 1.02B, Major dysfunction of an upper extremity join in the shoulder, arm, wrists, hands, from any disease process inclusive of carpal tunnel syndrome; 3.03, Asthma and Other Breathing Difficulties; 4.03, Hypertension; 7.05, Sickle cell disease; 9.08, Diabetes Mellitus; 12.04, Affective-Depressive Disorders; and 14.06, Undifferentiated connective tissue disorder inclusive for myalgias. Because Claimant did not meet a listing, the ALJ was required to assess Claimant's residual functional capacity ("RFC"), before proceeding to Step Four.

III.    Claimant's RFC

The ALJ concluded that Claimant has the RFC "for light exertion with postural, manipulative, environmental and vocational non-exertional limitations." (Tr. 29.) As for her

specific exertional limitations, Claimant can lift and carry ten pounds frequently; lift and carry twenty pounds occasionally; sit, stand, and walk for up to six hours cumulatively during an eight-hour day with normal breaks; and push-pull capacities are limited to her her upper extremities. (Tr. 29.) Claimant also has "manipulative non-exertional limitations," as follows. She cannot "engage in constant repetitive use of her hands bilaterally"; engage in more than occasional overhead reaching; engage in more than occasional climbing, bending, balancing, stooping, kneeling, crouching, and crawling. Claimant must also "avoid concentrated exposure to fumes, dust or gasses," and is restricted to "simple, routine, and repetitive work." (Tr. 30.)

This conclusion was based primarily on the fact that the ALJ did not find entirely credible Claimant's "allegations as to the intensity, persistence and limiting effects" of her pain. According to the ALJ, Claimant's allegations were not based on objective medical findings, her daily activities were more extensive than her complaints would allow, and her work as a pizza delivery driver demonstrated that she could perform somewhat strenuous work. In particular, the ALJ found that Claimant's "demonstrated ability to persist at a difficult and demanding job . . . [was] inconsistent with her claims of minimal ability to clean, cook, etc. and reflect[ed] her actual ability once she puts herself to task." (Tr. 29.) Finally, the ALJ stated that he "considered the PRTF assessment of February 2003 by the State Agency medical consultants and gives it no weight." (Tr. 29.) In support of this determination, the ALJ stated that the objective medical evidence supports a finding that Claimant's depression is non-severe.

IV.    Steps Four and Five

At Step Four, the ALJ found that Claimant had no past relevant work and, accordingly, did not have transferable job skills. (Tr. 30.) At Step Five, the ALJ found that jobs existed in the

national economy that Claimant could perform. At the 2004 hearing, the ALJ presented the VE with a hypothetical detailing Claimant's "age, education, work experience, and residual functional capacity." (Tr. 30.) In his 2006 decision, the ALJ cited the VE's 2004 testimony that Claimant was capable of performing jobs that exist in the national economy. The VE cited the representative occupations of "Food and Beverage Clerk," and "Storage and Rental Clerk." (Tr. 31.) According to the ALJ, both jobs "requir[e] no more than sedentary-to-light exertion at an unskilled work knowledge level." (Tr. 31.) The "Food and Beverage Clerk" position offers approximately 1,350 jobs in the region and 105,000 jobs in the national economy. The "Storage and Rental Clerk" position offers approximately 1,150 jobs in the region and 100,000 jobs in the national economy. (Tr. 31.) Based on this testimony, the ALJ found Claimant "not disabled under section 1614(a)(3)(A) of the Social Security Act." (Tr. 31.)

*Discussion*

Claimant objects to the ALJ's findings on five grounds: (1) the ALJ failed to consider the combined impact of Claimant's severe and non-severe impairments; (2) the ALJ failed to appropriately consider lay witness testimony; (3) the ALJ failed to appropriately evaluate claimant credibility; (4) the ALJ incorrectly relied on VE testimony; and (5) the ALJ did not fully and fairly develop the record. The court will address each ground in turn.

I.     Combined impact of Claimant's severe and non-severe impairments

At Step Two, an ALJ must consider both severe and non-severe impairments in combination when assessing a claimant's functionality. The Ninth Circuit described this inquiry in *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996):

the ALJ must consider the combined effect of all of the claimant's impairments on

her ability to function, without regard to whether each alone was sufficiently severe. Also, he is required to consider the claimant's subjective symptoms, such as pain or fatigue, in determining severity. Finally, the step-two inquiry is a de minimis screening device to dispose of groundless claims. An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual[']s ability to work.'

(quoting *Yuckert v. Bowen*, 841 F.2d 303, 306 (9th Cir. 1988) (internal citations omitted)). The Code of Federal Regulations provides that, in determining whether a claimant's severe and non-severe impairments amount to a disability under the law, the SSA will "consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." CFR § 416.923 (2008). "Because a person's ability to engage in gainful employment is dependent upon both physical and psychological capabilities," a court must consider both mental and physical impairments. *Beecher v. Heckler*, 756 F.2d 693, 694-695 (9th Cir. 1985). "According to the Commissioner's regulations, 'an impairment is not severe if it does not significantly limit the claimant's physical ability to do basic work activities.'" *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996).

Claimant argues that the ALJ did not address all of her impairments established by the record. In particular, Claimant contends that "[t]he ALJ did not discuss [Claimant's] obesity, nor her anxiety and panic attacks." (Pl.'s Br. 6.) Although the ALJ did address her depression, Claimant argues that the ALJ erred in classifying it as a non-severe impairment. Claimant also argues that the ALJ improperly classified as non-severe her asthma, diabetes, and hypertension. This finding, Claimant argues, was not supported by substantial evidence. (Pl.'s Br. 8.)

The Commissioner argues that, even if there was any error finding any of Claimant's impairments non-severe, it was harmless. Any error committed by an ALJ is harmless where it "was

11  FINDINGS & RECOMMENDATION                                            {KPR}

inconsequential to the ultimate nondisability determination." *Stout v. Commissioner*, 454 F.3d 1050 (9th Cir. 2006). The Commissioner cites *Lewis v. Apfel*, 498 F.3d 909 (9th Cir. 2007), for the proposition that where an ALJ errs in considering an impairment at Step Two, it is harmless if the ALJ "adequately considers the impairment's effects on the claimant's level of functioning." (Def.'s Br. 6.) In *Lewis*, the ALJ allegedly failed to consider the claimant's bursitis at Step Two of his analysis. The court wrote: "Even assuming that the ALJ erred in neglecting to list the bursitis at Step 2, any error was harmless. The ALJ extensively discussed Lewis's bursitis at Step 4 of the analysis . . . . The decision reflects that the ALJ considered any limitations posed by the bursitis at Step 4." *Id.* at 911. Here, the Commissioner asserts that the ALJ "included limitations from [Claimant's] non-severe impairments in his residual functional capacity finding," by limiting her to simple, routine, and repetitive work and by limiting her exposure to fumes, dust, and gasses. By including these limitations, the ALJ accounted for Claimant's depression and asthma. (Def.'s Br. 6.) Defendant also argues that Claimant did not establish that her obesity and hypertension gave rise to functional limitations not addressed by the ALJ.

Based on its review of the record, the court finds that the ALJ acted reasonably in classifying Claimant's impairments. First, Claimant's obesity, anxiety and panic attacks were not cited as "illnesses, injuries or conditions that limit[ed] [her] ability to work," on Claimant's application for disability benefits. (Tr. 47.) Further, the record evidence does not demonstrate that these are severe impairments. As to obesity in particular, the record discloses several notations that Claimant is obese or moderately obese and one notation that she is morbidly obese. There are several mentions that Claimant needs to control her weight via diet and exercise. At one point, Dr. Newcomb wrote that she "[was] a little alarmed at [Claimant's] obesity related issues, which are her diabetes and

hypertension . . . ." (Tr. 360.) Even so, the record does not reveal that Claimant's obesity is a severe impairment, nor does it disclose that Claimant's obesity presents functional limitations that should have been included in the RFC analysis.  Further, the ALJ explicitly addressed the ailments that Claimant's obesity may exacerbate, namely diabetes and hypertension.  Because obesity was not cited in the application as an impairment and the record evidence does not indicate functional limitations that result from obesity, the ALJ properly omitted a discussion of obesity from his opinion.  Even if the omission was improper, any error was "inconsequential to the ultimate disability determination." *Stout*, 454 F.3d at 1055.  There is no evidence that Claimant's obesity specifically gives rise to limitations above and beyond those addressed in the RFC analysis. Therefore, any error was harmless.

Second, the ALJ classified Claimant's depression as non-severe, a finding that is also supported by the record.  The evidence does not establish that depression has more than a minimal effect on Claimant's ability to work.  Claimant cites no evidence that undermines the ALJ's conclusion. Third, the ALJ's findings as to Claimant's asthma, diabetes, and hypertension were not improper and are supported by the record.  The ALJ's determinations are a rational interpretation of the evidence.

II.    Lay Witness Testimony

Claimant argues that the ALJ not only rejected, but completely failed to mention, the testimony of three lay witnesses.  First, the ALJ ignored testimony given by Claimant's mother at the September 27, 2004 hearing.  Second, the ALJ ignored testimony from Claimant's daughter given at the November 16, 2006, hearing.  (Tr. 438-452.)  Third, the ALJ ignored a statement submitted by Maria Rivera ("Rivera"), the Closing Manager at Abby's Legendary Pizza, where

Claimant worked as a pizza delivery driver from December 2005 to April 2006. (Tr. 278.) A review of the ALJ's written decision reveals that the ALJ did not mention or address testimony of Claimant's mother or of Claimant's daughter and referenced only portions of Rivera's statement.

In cases "where a claimant alleges pain or other symptoms that are '*not supported by medical evidence in the file*, the adjudicator *shall* obtain detailed descriptions of daily activities by directing specific inquiries about the pain and its effects to . . . third parties who would be likely to have such knowledge.'" *Smolen*, 80 F.3d at 1288 (quoting Social Security Ruling 88-13 (1988)) (emphasis in original). Where such lay testimony exists, the ALJ must give it "full consideration" and may "reject the testimony of lay witnesses only if he gives reasons germane to each witness whose testimony he rejects." *Id.* (quoting *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993)). Further, "the fact that a lay witness is a family member cannot be a ground for rejecting his or her testimony." *Id.* at 1289. Rather, it is valuable evidence that speaks to the realities of the claimant's everyday life. *Id.* (citing *Dodrill,* 12 F.3d at 919).

Here, the Commissioner admits that "[t]he ALJ erred by not discussing lay testimony from Plaintiff's mother or daughter," but argues that the error was harmless. (Def.'s Br. 7.) In the Ninth Circuit, an ALJ's failure to consider competent lay testimony is harmless error only if the reviewing court "can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." *Stout v. Commissioner,* 454 F.3d 1050, 1056 (9th Cir. 2006). The Commissioner argues that crediting "the lay testimony here would not lead any reasonable ALJ to find [Claimant] disabled." (Def.'s Br. 7.)

It is undisputed that the ALJ ignored much of the testimony of Claimant's lay witnesses. Therefore, the court must determine whether this error was harmless or if a reasonable ALJ could

have found Claimant disabled.  Claimant's mother, Ms. Haydee Pumarejo, testified before the ALJ at the September 27, 2004, hearing.  She stated that the Claimant frequently experiences pain from fibromyalgia that causes her whole body to ache.  (Tr. 395.)  Claimant is capable of standing for ten minutes, doing household chores for five or ten minutes, and cooking, but must take breaks every five minutes.  (Tr. 397-398.)  Claimant has difficulty walking, stooping, and getting up.  (Tr. 398.) Claimant cannot lift more than a few dishes at a time.  (Tr. 399.)  Claimant has asthma and uses an inhaler.  (Tr. 399.)

Claimant's daughter, Ms. Melissa Yzaguirre ("Melissa"), testified at the November 13, 2006, hearing before the ALJ.  Relevant testimony is as follows.  Melissa sees Claimant on a daily basis. (Tr. 439.)  Claimant can clean for ten or fifteen minutes and then needs to take a break.  (Tr. 443.) On "good days," claimant may be able to sustain activity for thirty minutes.  (Tr. 443-444.)  Claimant can do some shopping but gets out of breath and needs to use a shopping cart for support.  (Tr. 444.) On "bad days," Claimant is only capable of showering and brushing her teeth.  Bad days occur three to five days a week.  (Tr. 445.)  Melissa also helps her mother pay bills.  (Tr. 445.)

At the time Claimant worked at the pizza restaurant, Melissa observed the following. Claimant sometimes worked from approximately 4:00 or 5:00 p.m. to approximately 1:00 or 2:00 a.m.  (Tr. 446.)  Before leaving for work, Claimant would "wait for the last minute to be able to leave, because she want[ed] to get every bit of rest because she aches."  (Tr. 446.)  When Claimant returned from work, "she would be dead."  (Tr. 446.)  When questioned about the discrepancy between Claimant working ten hours and, conversely, only being able to stand for fifteen minutes, Melissa responded that "it was so hard for her to push through what she did.  She would take breaks frequently."  (Tr. 448.)

Melissa testified that Claimant was still capable of driving, for at least fifteen to twenty minutes. (Tr. 449.)  Regarding Claimant's anxiety, Melissa stated that she had taken Claimant to the hospital only last month after Claimant suffered a anxiety attack, where they learned that Claimant's blood pressure was high and her heart rate abnormal.  (Tr. 450.)  Melissa stated that Claimant "has a lot of depression," which contributes to her anxiety issues.  (Tr. 450.)

Rivera, Claimant's former supervisor from the pizza restaurant, submitted a statement on Claimant's behalf.  The statement first describes the duties of a delivery driver then describes Claimant's ability to perform those duties.  The duties included:  cutting and boxing pizzas, delivering pizzas, filling the ice machine, folding and stacking boxes, sweeping and mopping, doing dishes, filling containers of condiments, bussing tables, cleaning traps, degreasing sinks, and cleaning the work area in general. (Tr. 278-279.)  As for Claimant's ability to perform these duties, Riviera wrote:

> Lourdes experienced a lot of difficulty doing her work requirements.  She showed up on all her scheduled days even though she wasn't feeling well and experiencing a lot of pain.  She made a great deal of effort on all of her job duties even though it was difficult for her.  Lourdes was not able to lift the ice bucket and put in the ice machine.  She was not able to lift the mop bucket to empty water.  She needed a lot of help when she was experiencing a lot of pain.  Which was the majority of the time. . . . I could tell that Lourdes did the best that she could.  She stayed with Abby's for as long as she could take it.  I was really impressed that Lourdes stayed with us for as long as she did.

(Tr. 279.)  She wrote that Claimant was unable to "entirely" perform her job duties.  (Tr. 279.)

Based on the testimony of Claimant's mother and daughter, the court finds that the ALJ's error was not harmless.  If this testimony is credited as true, the Claimant is limited to standing for ten or fifteen minutes, except on good days when she may sustain activity for thirty minutes. On bad days, she is only capable of observing person hygiene.  Based on these limitations, Claimant would

be unable to perform the work identified by the ALJ and the VE, and the ALJ's rejection of the testimony of Claimant's mother and daughter was not harmless. Furthermore, because the ALJ concluded that Claimant's subjective complaints were not supported by the medical evidence, consideration of third party descriptions of Claimant's daily activities was required. *Smolen*, 80 F.3d at 1288. For this additional reason, the error was not harmless.

The statement of Rivera presents a closer question. In his opinion, the ALJ wrote that Claimant's "demonstrated ability to persist at a difficult and demanding job . . . is inconsistent with her claims of minimal ability to clean, cook, etc. and reflects her actual ability once she puts herself to task." (Tr. 29.) Again, the ALJ referenced certain parts of this statement, but ignored the part of the statement that dealt with the difficulties Claimant experienced at that job. Therefore, the court must determine whether crediting that portion as true would affect the ALJ's ultimate disability determination.

The ALJ, in determining disability, reasoned that if Claimant could work as a pizza delivery driver, she was not disabled. In light of the facts in this record, this conclusion is contrary to Ninth Circuit precedent. The Ninth Circuit has recognized

> that the Social Security Administration permits recipients of disability benefits to work on a trial basis without the trial work period adversely affecting their disability status. Specifically, when a recipient works for less than nine months, the Administration does not consider the trial work period as evidence that the individual is no longer disabled. *See* 20 C.F.R. §404.1592; *see also Moore v. Comm'r of the Soc. Sec. Admin.*, 278 F.3d 920, 924-25 (9th Cir. 2002) ("[T]he SSA's regulations provide for a 'trial work period' in which a claimant may 'test your ability to work and still be considered disabled.'" (quoting 20 C.F.R. § 404.1592)).

*Lingenfelter v. Astrue*, 504 F.3d 1028, 1039 (9th Cir. 2007).

In *Lingenfelter*, the claimant testified that he "had not worked since his injury in 1993, except

for a nine week period starting in February 1999. He stated that at that time he took a job washing

tour buses because he had 'no money, no income at all.'" *Id.* at 1033. The court concluded: "It does

not follow from the fact that a claimant tried to work for a short period of time and, because of his

impairments, *failed*, that he did not then experience pain and limitations severe enough to preclude

him from *maintaining* substantial gainful employment. Indeed, we have suggested that similar

evidence that a claimant tried to work and failed actually *supported* his allegations of disabling

pain." *Id.* at 1038.

   In this case, Claimant worked as a pizza delivery driver for between four and five months,

approximately one-half the length of time that the Ninth Circuit observed in *Lingenfelter* was not

evidence that the individual was not disabled. According to her testimony, Claimant worked

approximately forty hours per week. (Tr. 425-426.) Claimant missed one day due to illness. She

testified: "I tried very, very hard to stick with it, because I wanted to show and prove that I was

trying my best. But I was physically ill the whole time. I mean, I was in so much pain doing this that

I finally had to give up." (Tr. 426.) As for her motivation in getting the job in the first place,

Claimant testified that she "thought she could probably manage [delivering pizza] since the majority

of the time [she would] be sitting and driving, but it required so much more that [she] didn't know

before." (Tr. 428.) Accordingly, the court does not conclude that Claimant's failed work attempt

proves Claimant was not disabled.

III.   Claimant Credibility

   Claimant argues that the ALJ erroneously rejected her testimony based on an improper

credibility determination. Ninth Circuit precedent holds that

   [w]ithout affirmative evidence showing that the claimant is malingering, the

Commissioner's reasons for rejecting the claimant's testimony must be clear and convincing. If an ALJ finds that a claimant's testimony relating to the intensity of [her] pain and other limitations is unreliable, the ALJ must make a credibility determination citing the reasons why the testimony is unpersuasive.

*Morgan v. Commissioner*, 169 F.3d 595, 599 (9th Cir. 1999) (internal citations omitted). Claimant contends that the ALJ's reasons were not clear and convincing.

First, the ALJ questioned Claimant's credibility because Claimant blacked out a portion of an exhibit. The ALJ wrote: "The claimant's credibility is questionable in view of her changing medical records in a manner to enhance her chances of obtaining disability." (Tr. 27.) Claimant responds that this was an isolated incident of poor judgment on the part of an individual that had experienced years of suffering "from a chronic and disabling impairment: fibromyalgia," and was therefore an insufficient basis to reject her testimony. (Pl.'s Br. 12.) Second, the ALJ questioned the limitations Claimant reported to Dr. Newcomb because they conflicted with her failed work attempt as a pizza delivery driver. (Tr. 28.) Claimant references Rivera's testimony that Claimant was only able to work with a great deal of pain and difficulty. Third, the ALJ found that Claimant's "allegations as to the intensity, persistence and limiting effects of alleged symptoms [were] disproportionate and not supported by the objective medical findings or any other corroborating evidence." (Tr. 29.) Claimant counters that her symptoms were supported by medical records and lay testimony. Finally, the ALJ determined that Claimant's activities of daily living were inconsistent with her complaints of pain and stated limitations. (Tr. 29.) Claimant points out that she is only able to perform these activities with "extraordinary assistance" from her family. (Pl.'s Br. 11.)

The court agrees with the ALJ that Claimant undermined her own credibility when she

altered her medical records to enhance her disability claim. The content of the change, however, does not alter the court's disability analysis except to weigh against Claimant's overall credibility. Based on the analysis above, the court will not consider the failed work attempt in its disability analysis, nor will it weigh against Claimant's overall credibility. Finally, lay testimony reveals that Claimant did receive extensive help from her daughter in performing her daily activities, outside of personal hygiene. The ALJ failed to adequately account for this testimony and it is therefore credited as true. Accordingly, Claimant's ADLs do not undermine either her subjective symptom testimony or her credibility.

On the issue of whether Claimant's subjective complaints are disproportionate to the objective medical evidence, the *Cotton* test controls. "Under the Cotton test, a claimant who alleges disability based on subjective symptoms must produce objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged . . . ." *Smolen v. Chater*, 80 F.3d 1273 at 1281-1282 (citing *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) and *Cotton v. Bowen*, 799 F.2d 1403, 1407-08 (9th Cir. 1986)). Claimant need only produce objective evidence that she suffers from an impairment that "could reasonably be expected to (not that it did in fact) produce some degree of symptom." *Id.* at 1282. If the claimant meets this burden "and there is no affirmative evidence suggesting she is malingering, the ALJ may reject the claimant's testimony regarding the severity of her symptoms only if he makes specific findings stating clear and convincing reasons for doing so." *Id.* at 1283-1284.

Based on its review of the evidence, the court concludes that Claimant has produced evidence that she suffers from fibromyalgia. This is an impairment that could reasonably cause some degree of pain and Claimant has met her evidentiary burden with regard to her subjective symptomatology.

The ALJ, therefore, was therefore required to give clear and convincing reasons for rejecting her testimony as to the severity of these symptoms. Based on the foregoing analysis, the ALJ's reasons for rejecting Claimant's subjective complaints of pain do not withstand scrutiny and do not satisfy the ALJ's burden to provide clear and convincing reasons to reject Claimant's testimony.

IV.    Reliance on Vocational Expert Testimony

According to Claimant, the ALJ erred in finding that she could perform the jobs of Food and Beverage Clerk and Storage and Rental Clerk, because they both have a rating of "light work," and the Claimant's residual functional capacity limited Claimant to less than the full range of light work. (Pl.'s Br. 13.) The ALJ characterized both positions as "requiring no more than sedentary-to-light exertion," a characterization that is not supported by the job description. The Claimant also argues that the ALJ should not have relied on VE testimony from the 2004 hearing, because the hypothetical given at the 2004 hearing "omitted limitations based upon the full range of Ms. Yzaguirre's functional limitations . . . ." (Pl.'s Br. 15.) Claimant also points out that she was forty-four years old at the time of the 2004 hearing, but was forty-six years old at the time of the 2006 hearing. Under the regulations, for an individual under age forty-five, age "is usually not a significant factor in limiting such individuals ability to make an adjustment to other work." 20 C.F.R. Pt. 404, Subpt. P, App. 2(h)(2). For these reasons, Claimant contends that the ALJ failed to set forth all of her limitations and the VE's testimony lacks evidentiary value.

When the ALJ presents the VE with a hypothetical question, it "must set out *all* limitations and restrictions of the particular claimant, including, for example, pain and an inability to lift certain weights. 'If the assumptions in the hypothetical are not supported by the record, the opinion of the [VE] that claimant has a residual working capacity has no evidentiary value.'" *Embrey v. Bowen*,

21  FINDINGS & RECOMMENDATION                                              {KPR}

849 F.2d 418, 422 (9th Cir. 1988) (quoting *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984)) (internal citations omitted).

At the 2004 hearing, the ALJ gave the VE a hypothetical that described an individual as follows:  able to lift/carry twenty pounds occasionally and ten pounds frequently; able to stand and walk six hours out of an eight hour day; able to climb, bend, crouch, crawl, and reach overhead occasionally; capable of frequent repetitive use of hand for manipulation; should not experience concentrated exposure to gas and fumes; is limited to simple, one to four step work; and capable of only limited public interaction.  In response to this hypothetical, the VE stated that Claimant could perform the duties of a Food and Beverage Clerk and a Storage Facility Rental Clerk.  At the 2006 hearing, the ALJ did not consult a VE, instead relying on the VE testimony from the 2004 hearing. At the end of the 2006 hearing, the ALJ said: "I think I have all the vocational questions I need to ask, especially that which involves inability for assisted work.  So I'm going to rely on those that were asked last time since the limitations seem to vary." (Tr. 456.)

If the limitations stated in the hypothetical given at the 2004 hearing are insufficient to state the Claimant's limitations at the time of the 2006 hearing, then the ALJ cannot rely on the 2004 testimony of the VE.  In the 2004 hypothetical the individual had past relevant work as a general office clerk; in 2006, the ALJ found Claimant had no past relevant work.  The ALJ asked the VE, after outlining the hypothetical: "Could this hypothetical person do any of our Claimant's past relevant work?" (Tr. 403.)  The VE responded: "Past relevant work would be consistent with the hypothetical, Your Honor." (Tr. 403.)  This testimony alone demonstrates that the hypothetical given in 2004 was not directly applicable to the Claimant in 2006, who was adjudged to have no past relevant work.

{KPR}

The court agrees that the ALJ erred in relying on the 2004 testimony of the VE, rather than presenting a VE with a hypothetical consistent with the limitations and changed circumstances of Claimant at her 2006 hearing.

V.    ALJ's Duty to Develop the Record

Claimant argues that the ALJ failed to fully and fairly develop the record. Prior to the 2006 hearing, Claimant requested that the ALJ order an examination by a rheumatologist to further evaluate her fibromyalgia. Claimant renewed this request at the 2006 hearing. The ALJ responded that further evaluation was unnecessary because he did not dispute that Claimant suffered from fibromyalgia. He stated: "[I]t's of almost no value to send her to a rheumatologist simply to verify the diagnosis of fibromyalgia when it seems fairly well identified as a diagnosis and the criteria to establish the diagnosis involves no objective medical testing whatsoever . . . ." (Tr. 422.) Claimant acknowledged this in her brief but maintains that "a completed physical residual functional capacity report by a rheumatologist was needed in order to fully and fairly develop the record." (Pl.'s Br. 16.)

The Commissioner responds that the ALJ has no duty to order a consultative examination where "the evidence as a whole is insufficient to support a decision in a claim." (Def.'s Br. 10.) *See* 20 C.F.R. 416.919a(b) ("A consultative examination may be purchased when the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on your claim.") Further, an ALJ has "broad latitude in ordering a consultative examination," and should only do so where there is an "ambiguity or insufficiency in the evidence [that] must be resolved." *Reed v. Massanari*, 270 F.3d 838, 842 (9th Cir. 2001) (quoting *Diaz v. Sec'y of Health and Human Servs.*, 898 F.2d 774, 778 (10th Cir. 1990); quoting 20 C.F.R. 404.1519a(b)(1), (4)). Here, Claimant cites no instances of ambiguity or insufficiency in the record evidence. Therefore, the ALJ's failure to order an

examination by a rheumatologist does not violate the ALJ's duty to develop the record.

Claimant also argues that the ALJ's failure to order a psychological examination was clear error, but provides no analysis to support this contention. Claimant failed to demonstrate how the record evidence concerning Claimant's psychological health was ambiguous or otherwise insufficient to support the ALJ's determination. The ALJ acknowledged that Claimant suffered from depression, though he classified it as non-severe. (Tr. 26.) The ALJ cited Dr. Owen-Taylor's report that she had a "long discussion with [Claimant] regarding the antidepressant medication Zoloft . . . ." (Tr. 26.) The ALJ also cited Dr. Owen-Taylor's August 26, 2004, report wherein she diagnosed Claimant with mild depression. (Tr. 27.) Again, Claimant cites no evidence at odds with this diagnosis and gives the court no reason to find the ALJ had a duty to develop the record as to Claimant's psychological health.

## VI.   Remand

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel,* 211 F.3d 1172, 1178 (9th Cir. 2000), *cert. denied,* 531 U.S. 1038 (2000). The court's decision turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is not sufficient to support the Commissioner's decision. *Rodriguez v. Bowen,* 876 F.2d 759, 763 (9th Cir. 1989).

Here, the ALJ failed to properly consider lay witness testimony, gave insufficient reasons to discount Claimant's testimony and relied on a hypothetical not fully supported by the record. However, the court finds that an award of benefits at this stage is not appropriate. Instead, the

decision of the Commissioner should be remanded to the ALJ to (1) adequately address lay witness testimony, (2) properly evaluate Claimant credibility, and (3) if necessary, present a hypothetical that is fully supported by the record.  The ALJ is also free to reconsider any other determinations.

### Conclusion

For the reasons set forth above, the decision of the Commissioner denying Claimant's application should be reversed and remanded for further proceedings.

### Scheduling Order

The above Findings and Recommendation will be referred to a United States District Judge for review.  Objections, if any, are due no later than January 1, 2009.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

If objections are filed, any party may file a response within fourteen days after the date the objections are filed.  Review of the Findings and Recommendation will go under advisement when the response is due or filed, whichever date is earlier.

DATED this 18th day of December, 2008.

JOHN V. ACOSTA
United States Magistrate Judge